**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case # 1:22-cr-00121-TNM** |
| | : | |
| **v.** | : | |
| | : | |
| **Jared Paul Cantrell** | : | |
| **Quentin G. Cantrell** | : | |
| **Eric Andrew Cantrell** | : | |

<u>**MOTION TO DISMISS ALL COUNTS
AGAINST QUENTIN G. CANTRELL**</u>

Pursuant to Fed. R. Crim. P. 12(b) Defendant Quentin G. Cantrell moves to dismiss

Counts One, Two, Three, and Four, and in support of the motion sets forth the following facts

and argument.

**1.     Introduction**

Quentin G. Cantrell (hereinafter "QGC") is charged with four misdemeanor charges, the

same four with which all January 6 defendants are apparently being charged:

(1) knowingly entering and remaining in a restricted building (18 U.S.C. § 1752(a)(1));

(2) knowingly engaging in disorderly or disruptive conduct with the intent to impede

Government business (18 U.S.C. § 1752(a)(2));

(3) violent entry and disorderly conduct, namely, willfully and knowingly uttering loud,

threatening, or abusive language, or engaging in disorderly or disruptive conduct with

the intent to impede a session of Congress (40 U.S.C. § 5104(e)(2)(D));

(4) violent entry and disorderly conduct, namely, parading demonstrating, or picketing in

any of the Capitol Buildings (40 U.S.C. § 5104(e)(2)(G)).

For the purposes of this motion, QGC adopts the elements of the offenses of the charges from the Government's Trial Brief in *U.S. v. Martin*, which this Court adopted in that case.  *U.S.A. v. Martin*, Trial Transcript, Day 2, p. 267.

All of the charges arise out of the events of January 6, 2021.

QGC respectfully moves this Court to dismiss with prejudice all counts, for the reasons set forth below.

## II.     LEGAL STANDARD

A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.  Fed. R. Crim. P. 12(b)(1).  "[I]t is an unusual circumstance for the district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29."  *U.S. v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005).  Nevertheless, the Court of Appeals for the District of Columbia has joined other circuits in upholding a district court's pretrial dismissal based on a question of law.  *Id*.

"After *Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be … to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 313-20 (1979)(*citing In re Winship*, 397 U.S. 358 (1970).  Thus, in order to survive a motion to dismiss based on insufficiency of the evidence, the issue the court must decide is whether a reasonable jury could conclude that every element of the crime has been proved beyond a reasonable doubt.

III.     **STATEMENT OF FACTS**

1.      At the April 27 hearing, the Court reminded the parties that this matter concerns only misdemeanors and ordered that the Government complete production of its evidence by the July 1 status conference.  The Court also ordered that any plea negotiations be sufficiently complete to allow the case to proceed.

2.      The prosecutor's office has organized the evidence shared with defendants into two categories: (1) evidence that the Government regards as specifically relevant to a particular case, and (2) "global discovery," which includes a number of categories of evidence that the Government (correctly) believes may or may not be of interest to any particular January 6 defendant.  Examples of such global discovery include such things as "documents commonly requested by defense counsel, e.g. investigations to [*sic*] allegations of officer complicity," "case-specific materials from other subjects' investigations, such as the results of searches of digital devices," and "case-specific materials from other subjects' investigations."  *See* Exs. A, B (letters of May 5, 2022, and April 25, 2022 from the U.S. Department of Justice).

3.      The Government does not tell defendants what makes evidence "case specific."  Whether it is because, for instance, a video includes the defendant, or may be exculpatory, is not clear.

4.      To date, the evidence in both categories have been made available to defense counsel by means of a variety of different software platforms.  Evidence that the Government has indicated is specifically relevant to the Cantrells' case was placed the USAfx portal (including what appears to be some of the evidence from the pre-arrest investigation of all three Cantrells), but other information, apparently belonging to the "global discovery" category, has been made available via two other platforms, "evidence.com" and "Relativity," a commercial platform.

5.      Because access to discovery has been provided through this variety of software platforms, counsel for QGC has gained access to discovery on a rolling basis, as the curators of the databases have provided the requisite passwords and training to allow their use.  Access to the last of the discovery platforms became available on June 22, when someone associated with the "evidence.com" website provided counsel for QGC with the necessary credentials to access the database.

6.      The Government has produced six CCTV videos from the Capitol Building via the USAfx platform.  Two of them show QGC peacefully and quietly entering the Upper West Terrace entrance at about 2:37:45pm and peacefully and quietly leaving again less than two minutes later, at about 2:39:40pm.  *Available at* USAfx portal, 2022-05-05 Production Serial 59 - CCTV - Highly Sensitive 0126 USCS 01 Upper West Terrace – 2021-01-06_19h20min01s (*at* 2:37:45pm-2:39:40pm); 2022-05-05 Production Serial 59 - CCTV - Highly Sensitive 0912 USCS 01 Upper West Terrace Door – 2021-01-06_19h20min00s, (*at* 2:37:55pm-2:39:35pm). The other four CCTV videos do not show QGC.

7.      The Government has also made available about 14 documents that it has indicated are specifically relevant to QGC's case, all through the USAfx portal.  These documents all appear to be records from Verizon, which appear to relate to QGC's cell phone account and communications.  In addition, the Government has made available through the USAfx database approximately 200 documents that it has labeled "Serials-Sensitive," which it has not identified as being specifically relevant to QGC's case, though they are apparently relevant to at least one of the three Cantrell, as they were placed in the "Cantrells" folder of the USAfx portal.  After review, these appear to include a half-dozen or so documents (such as QGC's driver's license),

which also appear to be aimed at identifying him in the two videos.  *See* Ex. A (attached Discovery Index).

8.      None of these documents appear to provide much useful information beyond having assisted the affiant to identify QGC, so that he could testify that QGC was present in the two videos.

9.      All discovery in this case that was not produced via the USAfx portal has been "global discovery."   Global discovery has been produced in 16 different batches, (see Exs. A, B, C and D).  Batch 2, alone, comprised over one terabyte of data, while Batch 3 comprised over three additional terabytes.  *See* Ex. B, pp. 5-6.  Although this database is sufficiently enormous as to render a complete review challenging, judging by the general categories of information described in the Department of Justice's letters, it seems an unlikely place to find the Government's prima facie evidence.  *Id*, at p. 1.

10.      After the April 27 hearing, the prosecutor in this case apparently learned that she was returning to her home office in Georgia, and that another prosecutor would be assigned to this case.  Her email response indicated that she was out of the office until June 27.  Ex. E.

11.      Counsel for QGC contacted the new prosecutor as promptly as feasible after he took over the case for the previous prosecutor(s), on June 15, and raised the issue that the Government has failed to produce any evidence to show the requisite mens rea of QGC.

12.      Counsel understood the prosecutor to indicate that there was evidence upon which the Government could make its prima facie showing of mens rea, which might be found in the databases containing the "global discovery," and encouraged counsel for QGC to go look at the "evidence.com" database (along with the production letters).

13.     On June 22, counsel for QGC secured access to the evidence.com database, and

confirmed that it had not been organized to allow defendants to identify evidence that the

Government intends to use in its prima facie case.

14.     Later that day, counsel for QGC again contacted the prosecutor, and again informed him

that, to the best of the defendant's ability to determine, the Government had not provided

sufficient evidence to make out a prima facie case.  In particular, he advised the prosecutor that

the Government had not presented evidence to show that (1) QGC had actual knowledge that the

Capitol Building had been declared a restricted area at the relevant time; or (2) that QGC had

ever performed any violent or disruptive act.  Ex. F (email from David Issa, counsel for QGC, to

prosecutor Kiok).

15.     Two days later, the prosecutor responded by email, stating that "nearly all" of the case-

specific material had been turned over.  The response did not identify any additional evidence.

Ex. F (email response from prosecutor Kiok, June 24, 2022).

16.     The email went on to say that "it is not impossible … that at some future time [the

Government] will discover[] some video or other evidence that depicts your client[]."  *Id.*

17.     On the morning of June 28, the Government transmitted a new letter regarding the 16th

round of global production.  This global production consisted of (a) additional video evidence,

including interviews with police officers and from security cameras from Constitution and

Independence Avenues, produced on the Relativity and evidence.com platforms, and (b) indexes

of the various videos and documents on those platforms.  After Round 16, counsel for QGC's

search of Relativity found approximately 774 thousand records, including thousands of hours of

video.

18.     According to the DOJ's letter of June 28, materials in the Relativity database can be filtered by the name of an individual, by searching under the "CODE_IndividualDefendant" field.  Relativity's drop-down menu for the field "CODE_IndividualDefendant" listed the defendants alphabetically by last name, but "Cantrell" was not on the list.

19.     A text search of all the records on Relatively for "Cantrell" returned only about 25 hits, none of which appear relevant to QGC.

20.     Figure 5 in the criminal complaint was taken from "open source video."  Criminal Complaint, Dkt 1, p. 8.  That video was therefore apparently in the hands of the Government, yet it had not been identified and produced.  Counsel for QGC therefore again contacted prosecutor Kiok and asked where the video evidence was.  Ex. G (email exchange between prosecutor Kiok and David Issa).

21.     Counsel discovered folders prosecutor believed to contain videos were empty. Prosecutor Kiok hypothesized this was a result of periodic deletions of files in USAfx.  As of June 29, the relevant folder did not contain any files Counsel can access.  After again contacting prosecutor Kiok, these videos were uploaded to the USAfx portal on the morning of June 30. *Available at* USAfx 2022-04-11 Production, Serial 71 - Video from Rioter's Cell Phone IMAG_0781.MOV; 2022-04-11 Production, Serial 66 - Open Source VideoJanuary 6, 2021 Washington, D.C. Protest to Stop The Steal -.mp4.

22.     As of the filing of this motion, the prosecution has produced no additional evidence.

## IV.   ARGUMENT

The evidence produced thus far showing QGC's conduct on January 6 appears to consist of two CCTV videos, which show him peacefully entering the Capitol Building, passing several police officers, none of whom make any effort to dissuade him from passing, and then peacefully

departing less than two minutes later.  (*See* Facts ¶6).  The Government has also produced other videos, from which still photos in the affidavit in support of the criminal complaint were presumably taken.  Dkt 1, pp. 4, 8-10.  One shows QGC peacefully walking to Capitol Hill. Facts, ¶21.  Another shows him standing peacefully on the West Terrace.  *Id*. One shows him attempting to depart the Capitol by attempting (unsuccessfully), to climb down over the wall of the northwest stairway.  *Id*.  Other As discussed below, the Government's evidence is legally insufficient to permit a reasonable jury to find, beyond a reasonable doubt, each of the elements of any of the four counts.

### A.  The Court Should Enforce its Scheduling Order

The Court has ordered that the Government produce its prima facie evidence to QGC by the July 1 status conference.  As of the filing of this Motion, the Government has made available the evidence identified in the Appendix to Exhibit A, though subject to possible deletions *See* Facts ¶¶20, 21.  It has, in addition, identified two massive databases of what it refers to as "global discovery," by which it apparently means evidence that the defense might wish to use, depending on which defenses it might seek to assert.  *See* Exhibit B.  "Global discovery" apparently includes evidence that is not even curated by the Government; such evidence is placed in "global discovery" by defense counsel in other January 6 cases.  It does not appear that the Government's intent is for any of its prima facie evidence to be produced through "global discovery."  Counsel for QGC recognizes that managed ideally, this is a reasonable procedure for delivering to defense counsel such information as the Government reasonably can regarding

potentially exculpatory evidence, particularly given the scope of potentially relevant evidence in January 6 cases.

However, the Government responded to requests from counsel for QGC that the Government identify its evidence of mens rea in this case by suggesting that such evidence might be in the "global discovery" databases. If this were permitted, it would render the Government's plan for discovery unreasonable. These databases are titanic. They comprise at least 14 different batches, one of which (Product Round 2) comprises over a terabyte of data, and another of which (Production Round 3) comprises over three terabytes. Ex. B, pp. 5-6. A recent letter from the Government notes that sharing the video files contained in global discovery can take "hours or days." Ex. D, pp. 1, 4.

But it appears that the truth is worse than even this. When counsel for QGC asked the Government to identify its prima facie evidence, the Government responded by saying "it is possible" that the Government "will come into possession" of evidence depicting QGC. Ex. F. The hypothetical possibility that the Government could possibly find some evidence at some point in the future should not allow it to circumnavigate the Court's scheduling order.

QGC is being prejudiced so long as this case continues. He must consult with a probation officer whenever he leaves Indiana, and must seek leave of Court to leave the United States. Out of fear of "obstruction of justice," he cannot even speak to his cousins, Eric and Jared, and other members of the family who speak to more than one of them are fearful and uncomfortable. And, of course, being the subject of a criminal prosecution is expensive and emotionally stressful, particularly for a law abiding citizen who has never been charged with a crime before. None of this should continue if the Government cannot produce evidence sufficient to permit a reasonable jury to find that a crime has been committed.

The Court should preclude the Government from introducing any evidence that it has not specifically identified to QGC by the July 1 status conference—its mere presence in the colossal haystack of "global discovery" should not be sufficient—and the Motion to Dismiss should be evaluated based on the evidence identified by the Government and produced via the USAfx portal.

### B.  The Evidence Adduced to Date

As of the filing of this brief, the Government's evidence appears to consist of two CCTV videos of the foyer inside the Upper West Terrace entrance, a number of documents that appear to be aimed at identifying QGC in those videos, such as his driver's license and phone records, several other videos that show QGC walking to Capitol Hill, standing on the Upper West Terrace, and attempted to leave Capitol Hill.  Facts, ¶¶6, 20-21.  The Government has also produced a number of other videos that do not show QGC, but which depict some of the events on Capitol Hill that day.  *Id.*

### C.  Count One Should Be Dismissed Because There Is Insufficient Evidence QGC Knew That the Capitol Building Had Been Restricted

In order to survive a motion to dismiss, the Government's evidence must allow a reasonable jury to conclude that, beyond a reasonable doubt, both of the following are true:

1. The defendant entered or remained in a restricted building or grounds without lawful authority to do so; and

2. The defendant did so knowingly.

The evidence adduced to date is insufficient to permit a reasonable jury to conclude, beyond a reasonable doubt, that QGC knew that Capitol Hill was a restricted area on January 6.

CCTV video shows QGC peacefully entering and leaving through the Upper West Terrace entrance at about 2:38pm, along with dozens of others, all of whom pass several police

officers who stand aside and make no effort to either physically or orally dissuade the crowd from entering.  Facts, ¶6.  QGC was inside the Capitol Building for less than two minutes.  *Id*. Another video shows QGC standing peacefully on the West Terrace, and another shows QGC attempting, unsuccessfully, to leave Capitol Hill by trying to climb down the side of the staircase.  Dkt 1, pp. 9-10; *see* also Facts, ¶¶20, 21.

None of this constitutes sufficient evidence to permit a reasonable jury to find that QGC knew that Capitol Hill was restricted when he entered it.  In fact, there is substantial evidence to show that QGC believed that Capitol Hill was *not* restricted.  In the first place, Capitol Hill is generally open to the public—or, at least, historically had been.  The Secret Service apparently restricted it for the purpose of protecting proceedings there that day.  But the Government has not produced to QGC any evidence of means by which the Secret Service might have made that decision known to the public prior to the relevant time, much less how QGC might have learned of any such publication.

To the contrary, it is undisputed (and it is alleged in the criminal complaint, see Dkt. 1, pp. 8-9) that QGC walked to Capitol Hill from the "Stop the Steal" rally, at which then-President Trump quite literally invited attendees to go to Capitol Hill, saying (in part):

> Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them.
> Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.
> I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.[1]

---

[1] EX H, As one of the most important events in recent history, Trump's address on January 6 is a matter of public record, of which the Court may take judicial notice.  The transcript quoted here is taken from the website https://www.fox61.com/article/news/nation-world/trump-save-america-rally-speech-before-capitol-riot-transcript/507-07d5ea40-a357-4bd9-bdb2-6e5cc384f325?utm_campaign=snd-

To be clear, QGC is not arguing that he was in fact entitled to enter the Capitol grounds, nor is he arguing the affirmative defense of entrapment.  Rather, his argument is that the Government's prima facie showing has failed to establish the requisite state of mind—QGC did not *knowingly* enter a restricted area.  Whether Mr. Trump's invitation was appropriate is a matter of intense and recent debate, but, even if it was improper, those in attendance, including QGC, would have reasonably inferred from the invitation by the President of the United States that they were permitted to go to the Capitol.

The Government's evidence that QGC was present in the Capitol Building is inconsistent with QGC having a guilty mind.  Although he could easily have worn "black-block," a mask, or otherwise attempted to conceal his identity, he did not.  His demeanor is calm.  He does not look like someone who believes he is participating in a crime.  Facts, ¶6 (*circa* 2:37pm-2:40pm); *see also* Dkt 1, pp. 11-16 (identification of QGC in the criminal complaint).

Likewise, the conduct of the portion of the crowd and police that are captured on CCTV with QGC is further evidence that QGC believed the Capitol was not restricted.  The crowd was filtering in from the Upper West Terrace, and QGC followed behind dozens of others, all of whom were peacefully passing by several police officers.  Facts, ¶6 (*circa* 2:35pm-2:40pm).  None of the officers either objected or attempted to obstruct the crowd as they filtered in.  *Id*.  At other times (after QGC had left), police can be seen standing athwart the hallway, and the crowd does not attempt to move past them, though the police later voluntarily move out of the way and allow the crowd to pass again.  (Facts, ¶6, 2:40:00pm-2:44:30).  The officers in the hallway

---

autopilot&fbclid=IwAR3iMVr_drx_1aMDG8tumlliD9cFmDH7yOkYginGr5ce87KYhDjF4EYr 45M (last visited June 21, 2022), and is reproduced in Ex. I.

when QGC passed could equally well have blocked the crowd, or otherwise informed QGC that Capitol Hill was restricted and that he was not permitted to enter, but they did not.

Other January 6 courts have erroneously held that police inaction cannot, as a matter of law, constitute a defense to a crime. *See, e.g.*, *U.S. v. Williams*, Case No. 21-377 (BAH), Dkt. 87, p. 3. Their holdings misstate Supreme Court precedent, and, in any event, are inapplicable to the instant case, because QGC is arguing in this motion a failure in the Government's prima facie case, not the affirmative defense of entrapment.

The *Williams* court cites *Cox v. Louisiana*, 379 U.S. 559, 569–70 (1965); *U.S. v. Gutierrez-Gonzalez*, 184 F.3d 1160 (1999); and *Garcia v. Does*, 779 F.3d 84, 95 (2d Cir., 2015) for the broad proposition that "Settled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." These cases stand for no such proposition. *Gutierrez-Gonzalez* contains a good overview of the Supreme Court's precedent on entrapment estoppel, and holds that, in that case, the defendant's entrapment defense failed because the government agent that allegedly entrapped him was not "responsible for interpreting, administering, or enforcing the law defining the offense." *Gutierrez-Gonzalez*, at 1167. The government agent that allegedly entrapped the defendant, the "Diocesan Services," was not even a government agent. *Id.*, at 1168. In contrast, the Capitol Police were responsible for interpreting, administering, and enforcing limits on the crowd's behavior on Capitol Hill.

*Cox v. Louisiana* involved a conviction that was actually overturned. In *Cox v. Louisiana*, the defendant was a part of a group that originally was given permission by police to protest 101 feet from a courthouse, but was arrested after the police subsequently told the protesters to break up. *Cox*, at 369-72. Although police officers explicitly ordered the protesters to depart, the Supreme Court reversed the conviction.

In *Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015), the defense of entrapment was not even at issue. In *Garcia* "Occupy Wall Street" protesters had been arrested for disorderly conduct, namely, blocking traffic on a bridge. The protesters sued the arresting officers for false arrest on the ground that the police granted de facto permission by directing their parade onto the bridge. Thus, the entrapment defense was not even before the *Garcia* court:

> We are not concerned with whether plaintiffs' asserted belief that the officers' behavior had given them implied permission to violate traffic laws otherwise banning pedestrians from the roadway would constitute a defense to the charge of disorderly conduct; that issue would be presented to a court adjudicating the criminal charges against plaintiffs.

*Garcia v. Does*, 779 F.3d 84, 93. *Garcia* is a civil suit about whether the police had sufficient grounds to arrest, not a criminal suit about whether there was sufficient evidence to convict.

In other January 6 trials before this Court the Government has argued that it was unreasonable for other January 6 defendants to believe they were permitted to enter the Capitol because white signs had been attached to temporary fencing. To date, the Government has not produced any evidence to show (and it is not true) that QGC ever saw any such signage. Indeed, the Government has not produced to QGC any evidence at all regarding these signs. QGC learned of them only from the review of the transcript of another trial. Consequently, QGC still does not know what these signs looked like. QGC does not, for the purposes of this motion, dispute that any unauthorized individual who even set foot on the sidewalk surrounding Capitol Hill entered a restricted area. However, this Court found in *U.S. v. Martin* that, in view of the situation there on that day, including the presence of large numbers of mostly peaceful individuals inside the sidewalk, the reasonable (but mistaken) inference was that the grounds were not restricted. *See U.S. v. Martin*, Trial Transcript, Day 2, pp. 229, 267-68. The Court therefore appears to have held that, as a matter of law, mere presence on Capitol Hill is not

14

sufficient to find that an individual was guilty of violating 18 U.S.C. § 1752(a)(1).  QGC respectfully submits that this is equally true in this case.

As of June 30, the Government has uploaded additional video of things that happened on or near Capitol grounds.  QGC appears, briefly, in several of these videos.  These videos show him walking to the Capitol, standing peacefully on the West Terrace, and trying to leave Capitol Hill.  As with the CCTV video from the Upper West Terrace entrance, his conduct is calm and orderly, and his demeanor is quiet and peaceful.  These videos do not contain any evidence that QGC knew that Capitol Hill was restricted when he entered.

The Government's evidence, far from proving beyond a reasonable doubt that QGC knew the Capitol was a restricted area, tends to show that QGC did not know.  As a matter of law, no reasonable jury could find, beyond a reasonable doubt, that QGC knowingly entered or remained in a restricted area.  Count One should therefore be dismissed.

### D.  Count Two Should Be Dismissed Because There Is Insufficient Evidence that QGC Intended to Impede Government Business, or Acted Violently or Disruptively

In order to survive a motion to dismiss Count 2, the Government's evidence must be sufficient to permit a reasonable jury to find, beyond a reasonable doubt, each of the following:

1.  The defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2.  The defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3.  The defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" means being "unreasonably loud and disruptive under the circumstances." *U.S. v. Martin*, Dkt. 30 (Government's Trial Brief), pp. 9-10. "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process. *Id*.

The Government has adduced no evidence to show that (1) QGC acted violently, disorderly, or disruptively, much less that he did so with (2) the intent to impede government business. There is no evidence that QGC was ever loud, threatening, or abusive at any time on January 6. To the contrary, the CCTV footage shows only that QGC acted peacefully and quietly during the brief period he was inside the Capitol Building. Facts, ¶6 (*circa* 2:37pm-2:40pm). The videos of him outside the Capitol is similarly exculpatory. In one he is peacefully and quietly standing on the West Terrace (as shown in Fig. 5 of the criminal complaint.). In another, he attempts to leave the Capitol by trying (unsuccessfully) to climb down the wall of the stairs. In it, he is not "unreasonably loud and disruptive under the circumstances," and there is no evidence of any intent to impede government business.

The Court has previously held that government business on Capitol Hill was halted "well before" 2:57 (a time shortly before Mr. Martin entered the Capitol Building), and was not resumed until long after he left, so that, as a matter of law, Martin's conduct could not have impeded government business. *U.S.A. v. Martin*, Trial Transcript, Day 2, pp. 160, 270. QGC, who entered the building at approximately 2:37:45pm, and exited at about 2:39:40pm likewise could not have impeded government business.

Count Two should be dismissed for any and each of these reasons.

### E.  Count Three Should Be Dismissed Because There Is Insufficient Evidence that QGC Even So Much as Raised His Voice

In order to survive a motion to dismiss Count 3, the Government's evidence must be sufficient to permit a reasonable jury to find, beyond all reasonable doubt, each of the following elements:

1.  The defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings.

2.  The defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

3.  The defendant acted willfully and knowingly.

*U.S. v. Martin*, Dkt. 30, (Government's Trial Brief), pp. 10-11.

As in Part IV(D), regarding Count 2, the Government has not adduced any evidence to show that QGC acted violently, disruptively, or disorderly.  Likewise, there is no evidence that QGC intended to impede government business.  Count Three should be dismissed for either or both reasons.

### F.  Count Four Should Be Dismissed Because the Government's Evidence Shows QGC's Conduct to Be "Minimal and Nonserious"

In order to survive a motion to dismiss Count 4, the Government's evidence must be sufficient to permit a jury to find, beyond all reasonable doubt, each of the following elements:

1.  The defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings.

2.  The defendant acted willfully and knowingly.

The terms "parade" and "picket" have their ordinary meanings.  The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying.  *U.S. v. Martin*, Docket No. 30 (United States' Trial Brief), p. 11.

The Government has not identified any conduct that it contends constitutes parading, picketing, or demonstrating.  Reviewing the video of less than two minutes during which QGC was in the Capitol Building does not suggest any obvious candidates.  He is not carrying any signs, and he is not wearing "black-block" or any other uniform of contemporary protesters.  He isn't even wearing a T-shirt with a political slogan.  He never confronts a police officer, he never chants or shouts, and he never attempts to obstruct anyone from going where they want to go. He quietly and peacefully follows the crowd in, and then quietly and peacefully walks out.  In *U.S. v. Martin* the defendant did at least one thing that would render his conduct closer to parading or demonstrating than the conduct of QGC, namely, carrying a flag on a flagpole.  The Court nevertheless found that his conduct was "about as minimal and nonserious as I can imagine for a protestor in the Capitol on January 6th."  A fortiori, QGC's conduct was likewise sufficiently minimal and nonserious that, as a matter of law, it does not violate 40 U.S.C. § 5104(e)(2)(G).

Count Four should therefore be dismissed.

## IX.    Conclusion

For the foregoing reasons, QGC respectfully requests and moves the Court to dismiss all counts of the criminal information with prejudice.

**COLMENTER, HUMPHREY, ISSA AND ROJAS PLLC**

By:_____

David Issa

Texas Bar No. 24069971

Email:  davidissa@entraconsulting.com

11300 Richmond Ave. Ste K101

Houston, Texas 77082

Tel. (281)935-2693

Attorney for Defendant

QUENTIN G. CANTRELL

**Appendix A**

Table of Exhibits

Exhibit A:     Department of Justice, Letter of May 5, 2022 from prosecutor Alison Prout to, inter alia, counsel for QGC

Exhibit B:     Department of Justice, Letter of April 25, 2022 from Emily Miller, Chief of the Discovery Unit, to, inter alia, counsel for QGC

Exhibit C:     Department of Justice, Letter of May 9, 2022, from Emily Miller, Chief of the Discovery Unit, to, inter alia, counsel for QGC

Exhibit D:     Department of Justice, Letter of June 27, 2022, from Emily Miller, Chief of the Discovery Unit, to, inter alia, counsel for QGC

Exhibit E:     Automated email response from the mailbox of prosecutor Alison Prout, June 9, 2022

Exhibit F:     Email exchange between David Issa, counsel for QGC, and prosecutor Jeffrey Kiok (last communication June 24, 2022, 7:52am)

Exhibit G:     Email exchange between David Issa, counsel for QGC, and prosecutor Jeffrey Kiok (last communication June 29, 2022, 2:28pm)

Exhibit H:     Screen capture of Associated Press article on "Fox61" website, showing a transcript of Trump's speech at the "Stop the Steal" rally on January 6, 2021.